QUEENIE, LTD., Plaintiff,

v.

NYGARD INTERNATIONAL, Sears Roebuck & Co., and Mercantile Stores Co. Inc. Defendants.

Nygard International, Counterclaim Plaintiff,

v.

Queenie Ltd., Heavenly Fabrics, Inc., Marc Gardner, and Joseph Heaven, Counterclaim Defendants.

No. 99 Civ. 10286(NRB).

United States District Court, S.D. New York.

Jan. 7, 2002.

Marc Bogatin, A. Joseph Tandet, New York City, for Queenie, Ltd.

John F. Triggs, Camhy Karlinsky & Stein, LLP, New York City, for Nygard Intern., Sears, Roebuck and Co., Mercantile Stores Co., Inc.

## MEMORANDUM AND ORDER

BUCHWALD, District Judge.

Queenie, Ltd. ("Queenie") brought this case in 1999, alleging that Nygard International ("Nygard"), Sears Roebock & Company, and Mercantile Stores Co. Inc. (collectively "defendants" or "the Nygard parties") infringed its registered copyright

in two fabric patterns, the Nuts and the Leaves patterns. Subsequently, Nygard brought a counterclaim against Queenie, Heavenly Fabrics, Inc. ("Heavenly Fabrics"), Marc Gardner ("Gardner"), and Joseph Heaven ("Heaven") (collectively "counterclaim defendants") for tortious interference with economic advantage, alleging that counterclaim defendants falsely registered both copyrights and wrongfully prosecuted this lawsuit against Nygard. A jury trial was held from October 9 to October 12, 2001. The jury rejected plaintiff's claims of copyright infringement on both patterns and found the counterclaim defendants liable for tortious interference with economic advantage, awarding punitive damages to Nygard in the amount of $250,000 against Queenie, $250,000 against Heavenly Fabrics, $500,000 against Gardner, and $500,000 against Heaven.

Currently before the Court is plaintiff's and counterclaim defendants' motion for a new trial pursuant to Federal Rule of Civil Procedure 59, for a remittitur of the punitive damage award, and for judgment as a matter of law pursuant to Rule 50. Also before the Court is Nygard's application for attorney's fees. For the reasons stated below, plaintiff's and counterclaim defendants' motion is denied and Nygard's motion is granted.

## I. Motion for a New Trial

■ Plaintiff's motion for a new trial is predicated upon this Court's ruling permitting the defendants to call Ms. Dong Mi Chung ("Chung") as a witness during trial. *See* Pl.'s Letter, dated October 22, 2001. When the Nygard parties called Chung as a witness, counsel for Queenie objected on grounds that Chung had not been included on defendants' witness list, and that her testimony was a complete surprise that would unduly prejudice the plaintiff's case. *See* Tr. at 284; Fed. R.Civ.P. 26(a)(3)(A). In response, the Nygard parties made several arguments.

First, defendants argued that Chung did not have to be identified in advance of trial because her testimony was only being offered for impeachment as provided for in Federal Rule of Civil Procedure 26(a)(3). *See* Tr. at 285–86. Defendants argued that because Heaven had testified during plaintiff's case-in-chief that Chung had created the fabric designs at issue, the door had been opened by plaintiff to allow Chung herself to take the stand and testify that she had taken no part in the creation of these designs. Second, the Nygard parties argued that plaintiff's claims of unfair surprise were disingenuous given that plaintiff itself had subpoenaed Chung prior to the trial and had ultimately decided several days before trial not to call her as a witness after learning the substance of Chung's proposed testimony from her lawyer, Matthew J. Jeon. *See id.;* Def.'s Letter, dated October 24, 2001.

After hearing the argument, I permitted Chung to testify on the grounds that the plaintiff had itself subpoenaed Chung in anticipation of trial, knew the content of Chung's proposed testimony, and would therefore suffer no unfair surprise from the use of her testimony. *See id.* at 288; Def.'s Letter, dated October 24, 2001. Moreover, I concluded that if Chung's proposed testimony were true, barring her testimony would permit counterclaim defendants to expand a fraud upon the United States Copyright Office to a fraud upon the Court as well. *See id.* at 294 (noting that Rule 1 at all times requires that the rules be "interpreted in a fashion that is just"); *Clark v. Pennsylvania R.R. Co.,* 328 F.2d 591, 591–94 (2d Cir.1964) (allowing the amendment of a pre-trial order to add two additional witnesses whose testimony substantially rebutted plaintiff's, noting that departure from a strict adherence to pretrial statements is appropriate

**604**

"when the interests of justice make such a course desirable").[1]

 In this situation, the "interests of justice" mandated the admission of Chung's testimony. The surprise that defendants were calling Chung was mitigated by the facts that Chung, a former employee of Heavenly Fabrics, was more within the control of the plaintiff and counterclaim defendants than of the Nygard parties, and by plaintiff's knowledge of her anticipated testimony, which it had learned from her lawyer several days earlier as a result of its own subpoena. Obviously, independent of the litigation, plaintiff knew what the facts were concerning who created the fabric designs at issue. Additionally, the Court granted counsel for Queenie and the counterclaim defendants the brief adjournment they requested, as well as the opportunity to recall Heaven as a rebuttal witness. *See* Tr. at 293, 297–98.[2] For these reasons, the plaintiff's and counterclaim defendants' motion for a new trial on the grounds that Chung's testimony was inadmissible is denied.

## II. Remittitur of Punitive Damages

 Without citing any case law, the counterclaim defendants devote two sentences to the assertion that the amount of punitive damages awarded by the jury was excessive, without any proper basis in the

record, and should be remitted by the Court. *See* Pl.'s Letter, dated October 22, 2001. As a general rule, punitive damages are within the jury's discretion and will not be disturbed unless they are grossly excessive. *See Roy Export Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys., Inc.,* 672 F.2d 1095, 1106 (1982). With respect to punitive damages for tortious interference, the jury charge in this case included an instruction that punitive damages "are appropriate only for especially shocking and offensive misconduct.... [I]f you decide to award punitive damages, you must use sound reason in setting the amount—it must not reflect bias, prejudice, or sympathy for any party." *See* Tr. at 546 (adapted from 1 L. Sand, et al., Modern Federal Jury Instructions § 77.01, Instruction 77–5). The jury was properly charged as to the purpose and significance of punitive damages, and its verdict was not grossly excessive. *See BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) (establishing factors for determining whether punitive damage award is excessive, including degree of reprehensibility, ratio of actual harm to punitive damage award, and comparison with other penalties for comparable misconduct). While the jury was not asked to determine the actual amount of compensatory damages,

1. Indeed, Queenie added a witness to its list on the opening day of the original trial.

2. We also note that an adverse inference might have been established from the plaintiff's and counterclaim defendants' failure to call Chung, a former long-time employee of Heavenly Fabrics, after Heaven testified that Chung alone was the creator of the designs. To establish an adverse inference for a missing witness, Nygard would have had to show that the counterclaim defendants had the ability to locate and produce Chung and had such a relationship with her as to make it natural to expect her to be called to testify on their behalf. *People v. Keen,* 94 N.Y.2d 533, 539,

707 N.Y.S.2d 380, 383–84, 728 N.E.2d 979 (2000). To defeat such a charge, the counterclaim defendants would have had to show that the witness was not knowledgeable or that her testimony would be irrelevant or cumulative. *Id.; see also Martinelli v. Bridgeport Roman Catholic Diocesan Corp.,* 196 F.3d 409, 432 (1999) (upholding trial court's charge that the jury could draw a negative inference from Diocese's failure to produce as a witness the priest who plaintiff accused of sexual abuse); *see also* 1 L. Sand, et al., Modern Federal Jury Instructions § 75.01, Instructions 75–3 and 75–4 (jury instructions for uncalled witnesses not equally and equally available to both parties).

as explained in Part III, the jurors heard testimony about the earnings of the counterclaim defendants and of their profits from the Leaves and Nuts designs. *See, e.g.,* Tr. at 59–60, 523–24. Furthermore, with respect to the degree of reprehensibility, in finding liability for tortious interference, the jurors essentially found that the plaintiff and counterclaim defendants had perpetrated a fraud on the Copyright Office and had attempted to similarly deceive the Court and jury. For these reasons, the award was not excessive and counterclaim defendants' motion to reduce the punitive damage award is denied.

## III. Judgment as a Matter of Law

██ The counterclaim defendants assert that they are entitled to judgment as a matter of law on Nygard's counterclaim pursuant to Rule 50 due to Nygard's failure to introduce any proof at trial of actual damages.[3] *See* Pl.'s Letter, dated October 22, 2001. In advance of trial, the parties agreed to leave the determination of compensatory damages to the Court in the event that the jury found the counterclaim defendants liable for tortious interference with economic advantage.[4] Counterclaim defendants assert, however, that this agreement did not relieve Nygard of its burden to establish to the jury that it had in fact incurred some damages. *See id.*

██ We believe that the agreement of the parties to leave the compensatory damages determination to the Court essentially waived the argument that the counterclaim defendants now seek to raise. But, in any event, Rule 50 expressly requires a party to make a motion for judgment as a matter of law "at any time before submission of the case to the jury." Fed.R.Civ.P. 50(a)(2). A party is barred from challenging the sufficiency of the evidence to support the jury's verdict on a given issue "unless it has timely moved in the district court for judgment as a matter of law on that issue." *Kirsch v. Fleet Street, Ltd.,* 148 F.3d 149, 164 (2d Cir. 1998). If, as the counterclaim defendants argue, the counterclaim plaintiff was required to but failed to introduce evidence of compensatory damages during the trial, a timely objection should have been made before the case was submitted to the jury.[5] Because counterclaim defendants failed to raise the objection in a timely manner, their motion for judgment as a matter of law is denied.

3. Citing several New York cases, counterclaim defendants further assert that punitive damages may not be awarded under New York law unless the alleged tortious conduct is aimed at the general public and not solely a private party. While the Court needs not reach the merits of this argument given its holding in Part III of this opinion, this assertion is flatly wrong and is a misreading of the relevant case law. Such a limitation on punitive damages applies in breach of contract cases, but not in tort cases. *See New York Univ. v. Continental Ins. Co.,* 87 N.Y.2d 308, 315–16, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995) (applying this principal to a contract case); *Don Buchwald & Assoc., Inc. v. Rich,* 281 A.D.2d 329, 723 N.Y.S.2d 8 (1st Dept. 2001) (explaining that the public harm requirement is inapplicable to tort cases for breach of fiduciary duty).

4. At that time, the parties believed that the compensatory damages to be proven would consist of attorney's fees.

5. In fact, counterclaim defendants were given a second opportunity to so object when the jury returned a note specifically asking me to explain the kinds of harm that could fall within tortious interference with economic advantage. *See* Tr. at 551–52. In response, I said that it could pertain to the economic losses they listed in their note, but that "as this case has been structured, [the jurors] have not been asked to place a dollar value on those damages or losses. I will do that if you find that Nygard prevails on its counterclaim of tortious interference." *Id.* No objection was made at that time by counsel for the counterclaim defendants.

■ Furthermore, counterclaim defendants argue that because as a matter of New York law, a punitive damage award for tortious interference cannot stand without a finding of actual damages, the punitive damage award in this case must be set aside. *See Action House, Inc. v. Koolik,* 54 F.3d 1009, 1013–15 & n. 4 (2d Cir.1995) (a divided Second Circuit panel addressed whether jury charge was improper for failing to advise jury that punitive damages may be awarded only if compensatory damages are awarded); *Kronos v. AVX Corp.,* 81 N.Y.2d 90, 595 N.Y.S.2d 931, 612 N.E.2d 289 (1993) (holding that actual damages must be demonstrated in tortious interference with contract cases, and that nominal damages are insufficient).[6] In essence, counterclaim defendants now attack the incorporation in the jury instruction of an express agreement between the parties, made in advance of trial, that the punitive damage award would be determined by the jury and that the Court would later hear the arguments concerning compensatory damages.[7] Under Rule 51, "[n]o party may assign as error the giving or failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict." Fed.R.Civ.P. 51. A party who fails to so object thus waives the right to make that instruction the basis of an appeal. *Anderson v. Branen,* 17 F.3d 552, 556 (2d Cir.1994); *Girden v. Sandals Int'l,* 262 F.3d 195, 202 (2d Cir.2001). The purpose of such a rule is to allow the trial court to correct any defects in the charge before sending the jury to deliberate. *Fogarty v. Near N. Ins. Brokerage,* 162 F.3d 74, 79 (2d Cir.1998).

■ In this instance, not only did counterclaim defendants fail to object to the jury charge, they expressly agreed to bifurcate the damages determination. Having agreed to the charge and the bifurcation of damages, the counterclaim defendants have waived the point of law they seek to raise here. *See, e.g., Gardner v. Darling Stores Corp.,* 242 F.2d 3, 7 (2d Cir.1957) (holding that given the parties agreement before the verdict that 6% interest could be assessed on unliquidated damages, in accordance with which the judge instructed the jury, defendant's objection that it was mistaken as to the proper amount of interest was waived under Rule 51).

6. By agreement of all parties, the jury was instructed that if it found the counterclaim defendants liable for tortious interference with prospective economic advantage, the Court would determine the amount of compensatory damages to which Nygard was entitled. *See* Tr. at 544–45. The jury was then instructed as follows: "If you should find that the counterclaim defendants are liable for Nygard's injuries, then you would have the discretion to award punitive damages.... As I stated earlier, punitive damages consist of that amount of money awarded by you that is not to be considered as compensation to the counterclaim plaintiff for the wrong done, but that instead serves as the punishment to the counterclaims defendants and as a deterrent to others not to engage in such conduct." *Id.* at 545–46.

7. There were certainly good reasons for the parties to reach such an agreement. Nygard likely weighed the benefits of trying to establish compensatory damages before the jury against the costs and disadvantages. Such costs and disadvantages would include inconveniencing employees of its customers Sears and Mercantile by deposing them and asking them to testify at trial, and investigating and introducing evidence of how quantitatively the lawsuit "changed how [Nygard] do[es] business." *See* Tr. at 387–89. Counterclaim defendants, on the other hand, probably felt that additional evidence on Nygard's damages would serve only to magnify Nygard's assertions that the lawsuit itself was a fraudulent scheme to extract a settlement from a defendant faced with the high costs of defense. For these reasons, the agreement between the parties simply makes sense.

## IV. Nygard's Application for Attorney's Fees

■ Subsequent to trial, Nygard submitted a petition for attorney's fees in the amount of $340,486.50 and costs and disbursements in the amount of $39,918.41. Nygard seeks attorney's fees on two grounds: first, as a compensable injury for its tortious interference claim, and second, pursuant to the Copyright Act of 1976, 17 U.S.C. § 505. While we reject the contention that attorneys fees are compensable as actual damages for Nygard's tortious interference claim,[8] these fees and costs are compensable under the Copyright Act.

■ The Copyright Act, 17 U.S.C. § 505, provides in relevant part that in any copyright infringement action, "the court in its discretion may allow recovery of full costs by or against any party" and may "award a reasonable attorney's fee to the prevailing party as part of the costs." As is the case here, a prevailing defendant is to be treated like a prevailing plaintiff when such discretion to award costs is exercised. *Fogerty v. Fantasy*, 510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994). The decision to award fees is based on such factors as frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case), and the need to advance considerations of compensation and deterrence. *Id.* at 535 n. 19, 114 S.Ct. 1023; *see Crescent Publ'g Group, Inc. v. Playboy Enters., Inc.*, 246 F.3d 142, 147 (2d Cir.2001) (applying these factors); *Matthew Bender & Co., Inc. v. West Publ'g Co.*, 240 F.3d 116, 120–122 (2d Cir.2001) (discussing how these factors should be balanced).

Given the trial record, it is entirely appropriate to award attorney's fees and costs to Nygard as the prevailing party. The jury's verdict supports the conclusion that there was no factual or legal basis for a copyright infringement claim by Queenie, and that Queenie knowingly sued to enforce a copyright that had been fraudulently registered with the Copyright Office. Under the factors previously named, such conduct supports the award of attorney's fees.

■ Having decided to award fees, we apply the lodestar method to calculate reasonable fees. *Crescent Publishing*, 246 F.3d at 150 (adopting the lodestar method to determine reasonable fees under § 505). This method emphasizes a comparison to rates of lawyers of similar skill and experience in the community, *see id.*, and the adjustment of a lodestar figure considers such factors as (1) the time and labor required, (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in

---

**8.** Absent several exceptions that are inapplicable here, attorney's fees are not compensable as actual damages in a tort action. *See Coopers & Lybrand v. Levitt*, 52 A.D.2d 493, 496, 384 N.Y.S.2d 804, 807 (1st Dept.1976); *cf. Automotive Elec. Serv. Corp. v. Association of Automotive Aftermarket Distributors*, 747 F.Supp. 1483, 1507–08 (E.D.N.Y.1990) (holding that the damages element of a tortious interference with contract claim is not met where the only actual damages sustained are attorney's fees).

Because attorney's fees are awarded here only under the Copyright Act, and not as compensatory damages for Nygard's tortious interference claim, the attorney's fee award stands against Queenie alone, the sole plaintiff to the infringement action.

similar cases. *See United States Football League v. National Football League*, 887 F.2d 408, 415 (2d Cir.1989) (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974), and noting that the Supreme Court has adopted these factors while also noting that many of these factors are usually subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate). Significantly, contrary to Queenie's argument that "a client's assent to or payment of an attorney's bill is of limited or no relevance to a Court's independent determination of reasonableness," Pl.'s Letter, dated December 21, 2001, at 4, the actual billing arrangement is also relevant in determining a reasonable fee under the Copyright Act. *See Crescent Publ'g*, 246 F.3d at 150–51 ("The actual billing arrangement certainly provides a strong indication of what private parties believe is the 'reasonable' fee to be awarded.")

Queenie submitted a memorandum in opposition to Nygard's application for fees, detailing several specific objections. To determine the reasonableness of the fees to be awarded in this case, this Court held a hearing on December 18, 2001, at which Queenie's counsel was able to cross-examine Nygard's attorney with respect to specific assertions of unreasonableness in Nygard's fee application. *See Crescent Publ'g*, 246 F.3d at 147 (holding that where the party opposing the fee application indicates the existence of genuine disputes, the district court must permit such party to submit relevant evidence, and if appropriate, hold a hearing on the issue). At that hearing, John Triggs ("Triggs"), counsel for Nygard, testified about his billing arrangement with Nygard, including the fact that Nygard has paid every invoice documented in Nygard's fee application. *See* Hearing Tr. at 3–7. Triggs further responded to specific questions regarding itemized costs and hours billed. *See* Hearing Tr. at 8–40. Finally, Triggs testified as to his thirty years of experience as a trial attorney, noting that he has tried over one hundred cases all over the country and that his particular expertise is in intellectual property litigation. *See* Hearing Tr. at 36.

Through its examination of Triggs, Queenie suggested that the documentation provided by Nygard illustrated numerous examples of unreasonable fee requests. For instance, Queenie suggested that it was unreasonable to use a lawyer already employed by Nygard's counsel who was fluent in Korean rather than a less expensive Korean translator to translate Korean business records. *See* Hearing Tr. at 12. As other examples, Queenie suggested that it was unnecessary for Triggs make a trip to Chicago to personally meet with his client, or for him to bill for the entire twenty hour plane flight to Korea where Triggs took depositions in this case. *See* Hearing Tr. at 16–20.

While the specific items relied on by Queenie are not singularly or in combination of particular moment or of great economic significance, we nonetheless conclude that it is not appropriate to shift to plaintiff responsibility for the approximately 1,320 hours expended by Nygard's counsel. While a party to a litigation may choose its own level of litigation expense, it may not impose its own approach on a losing adversary. *See Farmer v. Arabian Am. Oil Co.*, 31 F.R.D. 191, 193 (S.D.N.Y. 1962), *rev'd*, 324 F.2d 359 (2d Cir.1963), *rev'd*, 379 U.S. 227, 85 S.Ct. 411, 13 L.Ed.2d 248 (1964) (overruled on other grounds). While we recognize that the total hours represent the efforts of more than one lawyer as well as paralegals, nonetheless if we were to hypothecate one lawyer billing 35 hours a week on this case, that lawyer would have worked approximately 38 weeks on this matter. Viewed in that fashion, we conclude that a

complete shifting of fees to Queenie is not warranted.

■ For the purpose of determining the amount of fees for which Queeie should be responsible, we find it analytically helpful to consider pre-trial and trial time separately. Queenie's only challenge to Nygard's documentation of trial time fees was the presence of two paralegals during the entire trial and the intermittent and limited presence of two other paralegals, one of which was preparing to read deposition testimony in place of a witness. *See* Hearing Tr. at 28–34. We find Queenie's objection unpersuasive and find that no reductions are warranted for the trial period. The Nygard parties together were represented by a single attorney throughout the trial, and the cost of Nygard's paralegals combined did not exceed the cost of an associate. In this regard, it must be remembered that Queenie and the counterclaim defendants had two experienced lawyers present throughout the trial. Given that counsel had to prepare for and commence trial twice in this case,[9] as well as Triggs' evident mastery of the facts, clear presentation of Nygard's case, effective use of computer graphics to present evidence to the jury, and excellent result, we consider Nygard's fee request for the trial period to be reasonable. Therefore, Nygard is awarded attorney's fees in the amount of $101,711.50 for the roughly 450 billed hours documented for the period from September 1, 2001, to October 31, 2001.

■ For the pre-trial period, which spans from October of 1999 through August of 2001, Nygard requests attorney's fees for approximately 870 hours, for a total of $238,775.00. Again hypothecating a single lawyer working 35 billable hours a week, 870 hours amounts to approximately 25 weeks of work. Given the straightforward factual issues and the absence of novel legal issues or case dispositive motions, to shift attorney's fees for this number of hours would be unreasonable. Applying the various legal factors set forth in the cases and our own experience, we award attorney's fees in the amount of $119,387.50, representing half of the $238,775.00 requested by Nygard for the pre-trial phase. *See Luciano v. Olsten Corp.,* 109 F.3d 111, 117 (2d Cir.1997) (in determining reasonable fees, a district court may make "an across-the-board reduction in the amount of hours").

To sum up, we award attorney's fees in the amount of $221,099.00, representing $101,711.50 for the trial phase and $119,387.50 for the pre-trial phase. In addition, we award costs under the Copyright Act in the amount of $39,918.41.

### *CONCLUSION*

For the foregoing reasons, plaintiff's and counterclaim defendants' motion for a new trial, remittitur of punitive damages, and judgment as a matter of law is denied. Further, Nygard's motion for attorney's fees and costs is granted, and attorney's fees in the amount of $221,099.00 and costs in the amount of $39,918.41 are awarded to the Nygard parties, to be paid by Queenie as the non-prevailing party to the copyright action. A judgment has been signed embodying the jury's verdict and these holdings.

**SO ORDERED.**

9. Because the first trial in this case commenced on September 10, 2001 and was interrupted after only one day by the attacks on the World Trade Center, a mistrial was declared and trial was rescheduled for October 9, 2001.